## STEWART v. TOMLINSON.

There is a part performance of an oral contract of sale of land which under Rev. Civ. Code, § 1311, authorizes specific performance, where, in addition to payment of earnest money, the buyer, with the acquiescence of the vendor, sets out large shade trees in front of the property, though his actual occupancy of the house with his family commences after the refusal to perform.

Corson, J., dissenting.

(Opinion filed, July 3, 1907.)

Appeal from Circuit Court, Beadle County. Hon. CHAS. S. WHITING, Judge

Action by James Stewart against James Tomlinson. From a decree for plaintiff, defendant appeals. Affirmed.

*T. H. Null, C. A. Kelley,* and *James Byrnes,* for appellant.
*Crawford & Taylor,* for respondent.

FULLER, P. J. Appellant here seeks the reversal of a decree in equity requiring him to execute and deliver a warranty deed to respondent, conveying certain improved residence property in the city of Huron, pursuant to an oral agreement which the court found respondent had duly executed.                    ,

As the findings of fact amply sustain the conclusion reached, the sufficiency of the evidence to justify such findings is the important question to be determined on this appeal from the judgment and order overruling a motion for a new trial. There was testimony to show that the parties had long been near and amicable neighbors, and, that immediately prior to the transaction in question respondent sold his residence property to a railroad company for right of way purposes, and had reserved a house and large barn situated thereon, which he was obliged to remove to some other location within a short time. Being fully aware of this fact and that respondent, who was engaged in the drayage business, had no lots upon which to place such buildings, appellant went to respondent's barn on the morning of April 28, 1905, and opened negotiations for the sale of his property, by stating in effect that his business was rather poor, and his wife and children in ill health, and that he wanted to sell out, and would do so at a price low enough to be exceedingly attractive. He then took respondent to examine his property, consisting of four lots upon which a house was situated, and there offered to sell the same for $2,800. To show what then occurred, we quote from the testimony of respondent, who addressed himself to appellant in part as follows: "I am figuring on another piece of property, and if I drop this other and can decide to take this, will there be any certainty this will be all right? He says: "My word is as good as your money, and, if I was dealing with you, I would consider the same way. You go ahead and figure the matter over and make up your mind what you want to do. You can talk with my wife or phone.' And I said it was all right, so we didn't have any misunderstanding, so we

separated at that. That afternoon my wife and I went over and got the keys from Mrs. Tomlinson, and looked through the new house. Then I hitched up in the evening and drove down town, and met· Mr. Tomlinson on the street, going to the post office, and I said to him to get in, and we would drive to the post office, and I told him I would take the property, and he said, 'All right.' * * * I handed him $10,, and he accepted it, and after he took the $10 he said: "This was the same amount of money he took on this house before, and then it didn't go through.' The property I have described, the house and the 300 feet north of Second street and facing Nebraska street, is the property described in my complaint as lots 19, 20, 21, and 22, in block 23, Third Railway addition. I said to Mr. Tomlinson: 'I will give you more money.' And he said, 'No; my word is good, and $10 is as good as $100.' He said he had to go away for two or three days, and said the property was clear and all right, and would be back and fix it up all right, and that the deed would be fixed up on his return. I said I didn't wish to hurry him, but I had to get out soon, and it was a west front and I woud like to plant some trees as soon as possible, and he said: 'I will give you my word and honor and you can do as you want to, fix it up as you want to.' And that substantially is all that was said in this transaction." Having complete faith in this assurance, respondent made no furher attempt to purchase certain other property on which he held an option, and openly entered upon the premises May 1st with the knowledge and asquiscence of appellant, and engaged in planting shade trees 20 feet in height, and so large that the work required the assistance of a team of horses and several men for nearly a week. On the 28th day of April, before making the contract, respondent returned the key which he had taken that day for the purpose of examining the house, and did not have it in his possession again until the 5th day of May, when it was obtained from appellant's wife, with the direction to keep it.

Concerning what thereafter accurred, respondent testified as follows: "I kept the key and moved into the house after that, on the 8th day of May. I think it was on Monday, the following Monday from the 5th. The 5th was Friiday, I think. On the fol-

lowing Monday, I began to move in, and I have lived in the house since. Mr. Tomlinson has never furnished an abstract and deed of this property. I have demanded it of him. I demanded it on the 9th day of May. I spoke to him the Saturday before that would be the 6th, I think, down town on the street, and he made some excuse, said the papers were being fixed up, and I wanted to know if they couldn't finish them up. He said his wife wasn't very well, and he said 'she wouldn't sign them today.' I saw him in the evening, and I said: 'Let us get them together on Monday, and get this thing fixed up.' And he said, 'All right,' and started off. On Monday following I called him up over the phone at noon, and his wife answered the phone, and said he was at the barn, and in 15 or 20 minutes Mr. Tomlinson came to my place, and he said his wife simply refused to sign the deed. Said he ought to have told me sooner, but he had been trying to get her. He said he never got into a jackpot like this before; that he was sorry; that I might go and see her just as soon as I could, but didn't think it would do any good. He said he would see what would turn up. He gave no other reason for not having the deal closed up, except she would not sign it. I began to move in that evening. * * * Prior to commencing this suit I made a tender to Mr. Tomlinson of the balance of this money. This was to be a cash sale. It was to be paid in cash. On the 9th, the day following, I took Mr. Beach to the bank and got the money, and made a tender to him the balance, $2,790, in bills. I went to Tomlinson and tendered him the money. I told him I wanted the deed from him, and offered him the money, he said 'No,' and refused to take it, and offered me the $10 back I had given him. I refused to take it. I have brought the money into court here, deposited it with the clerk."

Though the contract was not in writing, it is maintained by counsel for respondent that the facts and circumstances bring the case within the exception to the statute of frauds contained in section 1311 of the Revised Civil Code, which reads as follows: "No agreement for the sale of real property, or of an interest therein, is valid unless the same, or some note or memorandum thereof, be in writing, and subscribed by the party to be charged,

or his agent thereunto authorized in writing; but this does not abridge the power of any court to compel the specific performance of any agreement for the sale of real property in case of part performance thereof." As to everything material about which there is any dispute respondent is corroborated by other witnesses, and especially by Mr. Earl Howard, a bystander at the post office, who was called upon to witness the transaction of April 28th, and to whom appellant stated the exact terms of the contract before accepting the partial payment of the agreed price of $2,800. It is quite clear that appellant was fully aware of and did not object to respondent's acts of ownership in the way of transplanting the large trees at considerable expense, but respondent's actual occupancy of the house with his family did not occur until the evening of the day appellant refused to perform the contract. While the evidence is conflicting in some particulars, there was enough to show that, by reason of appellant's acts, respondent was led into such a position with reference to the property that a failure to perform would result in injury hard to estimate in money, and operate as a fraud upon him.

As such facts and circustances bring the case within the statutory exception above quoted, and justify a court of equity in decreeing specific performance, the judgment appealed from is affirmed.

CORSON, J., dissents.